Alright, good morning everyone. Mr. Marshall, time to call the next case on the docket. Yes sir. Your Honor, this case on the docket 2-18-0333 A. Thomas O'Shea v. Bleek v. Bleek, defendant appellant. I remain on behalf of the defendant appellant, Mr. Thomas J. Potter. I remain on behalf of the defendant appellee, Mr. Charles B. Muscarello. Thank you. Mr. Potter, on behalf of the appellant, you may proceed. Thank you, Your Honor. May it please the court and counsel, I am Thomas J. Potter, on behalf of the appellant, Luke VanderBleek. Mr. VanderBleek and Mr. O'Shea were involved in a corporation which operated two pharmacies, one in Sycamore and one in Genoa. Mr. VanderBleek was a 51% shareholder and Mr. O'Shea was 49%. And Mr. O'Shea was also employed by the corporation as a pharmacist, so he also had an employment contract. Mr. VanderBleek did not. He was simply a shareholder. Obviously at some point they went on to sign a memorandum of understanding, right? They did, Your Honor. Let me ask you a threshold question to see if I understand this salient text. Is it true that when the agreement was signed, Mr. VanderBleek was represented by counsel? Correct, by myself. He understood the terms of the agreement? He did. He signed the terms of the agreement? He did. Okay. Then where did the case get off track? He's going to be making the argument that there's nothing wrong with this agreement, it was the product of negotiations, and I believe you probably drafted the agreement, correct? I drafted the letter. There was a letter drafted by me. There was a memorandum of understanding which referred back to the letter. I can't remember who actually drafted that, but part of the agreement I drafted, the letter part. So what would be the compelling reasons to undo this whole thing? Because it was based on economic duress, based on the breach of fiduciary duty by Mr. O'Shea in holding out. Here are these two guys in two pharmacies in grocery stores. The grocery stores are going to close. So as the trial judge said in the record that I quoted in the brief, they're going to be in a hard way, in a bad way, if this deal didn't go through. Mr. O'Shea here is holding out, saying I'm not going to sign this unless I get a bigger percentage than you do. I'm the 49% stockholder, but I want a bigger share than you. Let's assume you're exactly right about that. Isn't he entitled to try and get the best deal for himself? No. Why not? Because he has a fiduciary duty not only to his co-shareholder but to the corporation. The most important case on that issue is the labor risk case, which sets the standard. It's on pages 13 and 14. It's the one that quotes Judge Cardozo at some length. At the bottom of page 14, such claim, when the case was sent back, and they framed the issue of what should be tried when the case was sent back, such claim plainly presents an issue for the finder of fact, namely whether or not Dolan was serving his own interests or those of the partnership. Okay? So the question here is when O'Shea was holding out, saying I want a bigger percentage than you, even though I own less than you, was he serving the interests of the corporation or was he serving his own interests? Now, what should have happened is they should have said, okay, we're going to get the best deal we can from this buyer, and if we have grievances among ourselves or between ourselves, those can be dealt with linger by arbitration or by lawsuit or whatever. But the main sticking point was the non-compete clause, and the non-compete had nothing to do with the two owners. It had to do with the new buyer and whether the new buyer was going to require Mr. O'Shea to sign a non-compete. That's correct. So why shouldn't he ask for more in order to – because I take it your client wasn't giving up anything on the non-compete, correct? That's correct. But the issue was dealt with summarily. So if the non-compete were a half hour for three weeks, that's a lot different than if it's for 10 years for 1,000 miles. And the court dealt with that issue summarily and said, well, it's a non-compete, therefore he gets to do this as a matter of law. Let me go back to the basic question. Mr. Vanderbleek did not have to sign the agreement, did he? The non-compete? He didn't have to sign any of this, and yet he did. He did under – okay. That is correct. He didn't have to. I guess what I'm saying is if he was unsatisfied and there was legitimate questions he had that made him uncomfortable, then he shouldn't have signed that. Well, okay, and then have the deal blow up. They were down like to a week or 10 days before the buyer was going to walk. And then so it's easy to say that he shouldn't have signed. Well, what's he supposed to do? Say, okay, I want to sign this, and guess what? We've now got two small pharmacies and closed grocery stores. So you're acting like he really had a choice. No, what I'm saying is that this alleged duress is subjective. He wasn't required to sign it. And he felt he was under some pressure, but it was just the pressure of the circumstances. It was extreme pressure unlawfully, we say, exerted by someone in the fiduciary duty, by his counterpart in the corporation. So it would be your position that in order to fulfill his fiduciary duty, Mr. O'Shea should have simply signed the non-compete and just sort of taken one for the team? No, not necessarily. Non-compete, this was an extensive non-compete. It was a seven-mile radius for five years. That's not that much. That's the area where he's been working for 20 years. Well, okay, so he got a job with the buyer. He got to maintain the packaging business of the pharmacy. It was only a retail pharmacy. I think Luke did have to sign the non-compete, but it really didn't affect him because he was in Morris. He had no skin in that game. Correct. But Mr. O'Shea got to sign, got to retain the retail, the non-retail, like packaging for nursing homes and compounding, that business, and he got a job with the buyer. And he still says, I have to sign the non-compete. But wasn't the point that the buyer says, I want you to sign a non-compete so that we don't have this agreement, and six months from now you open your own pharmacy and all your clients follow you? Isn't that the point of the non-compete? Yes, it is. But the issue, but see, as I mentioned before, the way to have treated this was to say, okay, we'll get the best deal from the buyer. We'll put money in escrow like we tried to do, but the judge didn't see it that way. And if my signing this non-compete was worth X, then in the subsequent proceeding the finding should be that, yes, I actually gave up this much or that much, and I should be compensated for that. But to hold the deal hostage when you have a fiduciary duty I believe is just wrong. It is, in the light of this case, he is not acting for the benefit of the corporation. He is acting on his own behalf. I understand the nature of the argument, but go ahead. So any hard bargaining between partners then is a violation of fiduciary, a breach of fiduciary duty? If it invokes the fiduciary duty, like I said in my brief, he could have sold him his car or something that didn't have anything to do with fiduciary duty. But you cannot put your own interests above the interests of the entity. And that's the wrongful act here. Yeah, sure. I mean, there's a corporate opportunity doctrine. We have all these different doctrines that say that. You must deal faithfully and loyally to the entity that you serve, whether it's a corporation or a partnership. But the entity that would benefit then is your client, really, correct? Well, indirectly, as a shareholder. Right. So you have two people who are involved in this, nobody else. Correct. One person is holding out for a better deal for himself. And then if, in fact, he just goes ahead and signs it, he hurts himself, but he helps his partner. If he, I mean, Mr. O'Shea? If Mr. O'Shea signs the deal, doesn't make a mistake about it, and he's hurting himself, but he's helping his partner. He might. Well, don't ask what happens if he does sign. Ask what happens if he holds out and he doesn't sign it. Then the whole deal can fall apart. I know, but you're talking about the deal falling apart. I mean, they were an ongoing concern for all this time. Right. And they would continue to be an ongoing concern. Now, you mentioned that the grocery stores are closing. I understand that. But I'm guessing that Mr. O'Shea had nothing to do with the grocery stores closing. Correct. So, I mean, that's not at all incorrect on his part, is closing down the grocery stores. But with just circumstances. Right. So that's just the circumstances the business found itself in. Okay. Mr. Potter, in fairness to you, I've been spending all your time on the breach. What about this accounting judgment for the counterclaim in which you were seeking an accounting? Why did the court commit an error on that building? Well, the court essentially required us to keep Phase 2 in order to get past Phase 1. In Phase 1, it is only the proof of the parties' right to an accounting. We believe that the partners and the corporate shareholders have a right to an accounting from their counterpart. There's no case law that says there's an automatic right to an accounting. There is no case law that says that. Well, Your Honor, I know that. There's no case law in Illinois that says that. However, the courts treat accountings between corporate shareholders as if they're partners. And there are several cases that say that. The uniform and the partners, there are no cases that say partners per se are entitled to an accounting. But on the other hand, the cases that award the accounting to partners are based on the Uniform Partnership Act. So rather than say, as a matter of common law, we hold that, the courts just look at the Uniform Partnership Act and say, yeah, you're entitled to an accounting because of Section whatever. And I quote the Uniform Partnership Act. Now, the court, and I was concerned about this going in, the court was requiring us to actually prove that, for instance, there was too much money being paid to relief pharmacists, and the court said we didn't prove that. Well, that's a Phase II issue. We were just there, and it's clear from the transcript, we were just there on Phase I. So the issue should have been who kept track of the money in the corporation. That was Mr. O'Shea. What was his duty as far as accounting to his partner? Let me ask you this question to clarify this. I thought from the record Mr. Vanderbilt testified he controlled the books, he selected the accountants, and Mr. Vanderbilt received all the bank records. Is that true? He got copies of the – well, he didn't control the books. He had the server, the QuickBooks server was on his computer and more. Okay. He – the accountants would take the book, you know, take what was on the QuickBooks server and do what they do and prepare the tax returns. But he was able to access those records and look at them, right? He had the opportunity to do that. However, that's not – that does not fulfill a party's right to an accounting. A document dump is not – doesn't satisfy the requirement of an accounting. And in the Jackson case, which I cite in my brief, it says it's not sufficient – it's on the bottom of page 17 – it's not sufficient that he does not withhold or conceal such information, but it is incumbent upon him to disclose voluntarily all within his possession or knowledge from which a sound judgment of the value of the interest may be formed. In the absence of such full disclosure, all presumptions are against the fiduciary. All obscurities or doubts are taken adversely to him. So as I also say in my brief, we are not concerned about the actual numbers on the – that were entered into the books. We don't know – right now, we don't think any of those are particularly wrong. We're concerned about the back story. It's like for – why didn't Mr. O'Shea keep track of his vacation time, his hours worked pursuant to the employment contract? Why was he hiring so many relief pharmacists when he should have been working? That's not the kind of information that gets into the books. Are you seeking an accounting under a statutory right or under an equitable remedy? Equitable remedy. Not under a statutory right. The statute in the Business Corporation Act is more for when the corporation winds up. The court can order an accounting. I think this is an equitable remedy between co-shareholders. So, I mean, you've got two phases to this thing. You've got the entitlement to the accounting and then doing the actual accounting. Right. So, you have to show – I mean, the burden is on you to show an entitlement to the accounting under an equitable remedy. Correct. And some of the things to look at – well, first of all, there's no adequate remedy at law, but then there's breach of fiduciary duty and a number of other things. And isn't that what the hearing went to? Not necessarily forcing you to prove – to prove up phase two, but to show that there was a breach of fiduciary duty, there was a need for discovery, there was fraud, there were – these accounts were complex, all those different things that you look to with an equitable account. Correct, Your Honor. And – Well, so – Well, I'm – Because you – The second part of your question is correct. Well, you argued the opposite. I mean, you argued before that the judge was requiring you to prove up phase two in phase one in order to get to phase two. The second part of your – I should not have said correct. The fact – and it's in the Jackson that I just saw. Here's the guy who kept track of the money, and he took in the receipts, and he was the guy on site at both of those pharmacies. He was the one doing the staffing. He was the one doing the – taking vacations and the credit card, the airline miles, the five things that we had wanted the accounting for. That was the sort of thing that was within his knowledge. According to Jackson, he has the duty to come forward with all the information to back that up, to back up why he did what he did. And that is – that is what we seek. It is not under the BCA. Anything further? No. All right. Thank you very much, Mr. Pottinger. You'll have an opportunity to address the Court again in rebuttal. Thank you. Mr. Muscarello on behalf of the appellant.  I represent Mr. O'Shea. I'm going to try and cut to the chase on some of this. Okay. First of all, I want to talk just about the non-compete bill. Not only was Mr. O'Shea required to sign the non-compete, but his wife is a pharmacist and she was required to sign the non-compete as well. Okay. That's the area they lived. It was for five years. As far as – I'd like to kind of just address the accounting quickly and then go back to the summary judgment and maybe touch on some of the other issues. I think you guys have adequately stated, look, an accounting is an ethical right. You have to show some burden of proof before the burden of proof then shifts to the defendant. Okay. And there is no absolute right to accounting. The Court listened to three days of testimony on this. The Court held, and I'm going to quote it. Sorry if I'm quoting it, but, I realize that Mr. Vanderbilt has a number of suspicions as to his dealings. As to each of those issues I mentioned before, they're just speculation or suspicion with respect to these issues. And he goes on and he further says, you know, I used the term, I guess the term, the word suspicion by Mr. Vanderbilt to define suspicion. It's sitting at home and just coming up with ideas that could be true. Not there is evidence to support it. I didn't see evidence to move to the second stage of accounting. Whatever term you want to use, be it suspicion, reasonable grounds to believe, probable cause, I felt there was bare suspicion and did not have any evidentiary justification behind it. That was after three full days of trial. Okay. As opposed to counsel, didn't Mr. Vanderbilt have access to all of these records? Absolutely. They were in his house. The server was in his house. He controlled the server. I think counsel's point is it's not just, you know, numbers on a spreadsheet. It's, well, what happened to these vacation days and how come we're hiring all these extra people to work hours that I thought you were working? Well, they were in business together 13 years. None of this came up until after it closed. Okay. He had no problems with any of that. As far as the vacation days, the issue was really that the employment contract said at the beginning of the year, Mr. Vanderbilt, or excuse me, Mr. O'Shea acquired all his vacation days immediately on the first day of the year. So when they closed the company, he paid out all employees all their accrued vacation. Most of those employees had, you know, three months' worth of vacation. But Mr. O'Shea had 12 months because his contract provided otherwise. Okay. So that issue was resolved in the employment agreement. As far as the hours, these parties were together for 13 years. It was never an issue. Mr. O'Shea was never asked nor would he ever punch time cards on any of this. He was there all the time. If you look at the actual computer information that says how many of the prescriptions were generated, over 90% of them were from Mr. O'Shea. There's just no evidentiary support that he wasn't there and he wasn't working. There was just no basis for it. By the way, before you leave it, our standard of review on this issue is abuse of discretion. It is absolutely abuse of discretion. I know he argues otherwise, but there's plenty of case law that says it is abuse of discretion. And, in fact, I know he objected to one of the cases in saying it was not. But I would also point out that there's the Farrar v. Collins case, second district case, says the review of whether an accounting should or should not be granted is an abuse of discretion standard. So with that, I'd like to move on to the summary judgment issue, and then hopefully if I have enough time, I've lost track of where I am, I will touch on his request to amend his brief. With regards to the summary judgment issue, the summary judgment was issued based upon the contracts and the terms that they emerged into. The MOU was personally negotiated by Mr. Vanderbilt. The asset purchase agreement was negotiated between Mr. Vanderbilt and the buyer. He was represented, both subpoenas were represented by counsel. Mr. Vanderbilt testified he chose the higher of two offers to pursue and that he fully understood the terms of what he negotiated and he understood that Mr. O'Shea was going to receive more of the retention bonus than he was. Separate from the prescription retention bonuses, did your client receive over 49% of the assets? No. The distribution of the sale was $49.51. There were two slight variations of that. My client had negotiated to keep the depreciated non-cash assets to run the compounding and pharmacy business, which he was excluded from the non-compete on. In return, Mr. Vanderbilt received payment of all accounts receivable up front, not subject to collection. Mr. O'Shea assumed all collection risk. If it didn't collect, that would have come out of Mr. O'Shea's component. With regards to the retention bonuses, those were to be earned post-closing. Mr. O'Shea was working there to keep those prescriptions for customers at those locations. Mr. O'Shea originally argued, hey, I should earn all of that because it's based on my effort. Mr. Vanderbilt objected, and in fact, if you look at appendix 24, it's a letter from Mr. Potter to Mr. O'Shea's attorney saying, hey, we're all right with all the changes you want to make except the first retention benefit, which we want 50 percent of, and that's what we agreed to. So I have no idea where the idea of duress comes from. This was negotiated between two parties. He accepted it. He wanted to close on this. I think his argument is that Mr. Vanderbilt felt that he couldn't, quote, unquote, afford to let the deal slip by, and maybe he has a logical point, but it would seem to me that that's a subjective issue, and if you're unsatisfied, don't sign the agreement. Well, and I'm not sure that issue is even accurate. They were in stores that were closing, but they had pending leases. They could have moved. The time frame of the accelerated close came from the buyer. It didn't come from Mr. O'Shea, okay? So all of those external pressures had nothing to do with Mr. O'Shea. So, and if you look at, you know, the case law on what is duress, none of this is duress. Under the DeWitt case, where parties to an afforded fiduciary relationship, which are at arm's length and not able to deal in affairs on their own, and Mr. Vanderbilt clearly is. He owns other pharmacies. He's a knowledgeable guy. That is not duress. You know, duress is being bereft of the quality of mind to make a contract, or it is where somebody illegally or under a threat makes you sign something. For example, you know, the godfather is the great story of that, right? Hard bargaining or financial pressure, whether exerted by Mr. O'Shea or by others, is not duress upon him to sign that agreement. In fact, the case that Vanderbilt even cites in support of his proposition also makes that clear. Duress is shown by the fact that one is subjected to, is not shown by mere annoyance, vexation, personal embarrassment, difficult bargaining position, or pressure of financial circumstances. Unless wrongful or unlawful pressure is applied, there is no business compulsion or economic duress. There's no allegation there was unlawful pressure applied. There was basic negotiation between two parties here. And, you know, if you look at the record, it's clear that Mr. Vanderbilt did negotiate. He had counsel. He knew the deal. And quite frankly, the court reviewed this and determined that he hadn't even really met any burden of pleading with regards to duress. So there was really nothing there. As far as the Business Corporation Act requiring accounting, it does, but it doesn't apply in these circumstances. I don't think he argues otherwise. I do note that he takes significant time to argue partnership law. Well, the remedies of partnership law under the Partnership Act are obviously different than under the Corporation Act. And I think we all know that it's well said that if the legislature says this in one circumstance but says this in different circumstances, well, they do that for a reason because they're to be treated separately. But even if you took his argument that partnership applied, partnership law applied, which it doesn't, if you read section E of section or subsection E of section 4 of the Partnership Act, and I'm going to read it to you, it says, a partner does not violate a duty or obligations under this act or under the partnership agreement merely because the party's conduct furthers the party's own interests. In other words, you're allowed under Partnership Act to negotiate at arm's length. And that's exactly what occurred here. So I would like to cover a couple of other things. I lost track of time, but I do want to cover two other things. There were four orders, I think, that he has appealed. It's a little unclear, but the summary judgment, even after the summary judgment order was entered, I then proceeded on my declaratory judgment, and all of the money was ordered out. He did not appeal that order, to be honest. He appealed the denial of the accounting claim. He appealed the denial of a reconsideration. As far as the reconsideration, he alleged no new law, no new facts, or no misapplication of law. Therefore, the court summarily rejected that. And then finally, he filed a post-trial motion or a post-judgment motion where, again, argued reconsideration. The court rejected that based on the same exact terms or for the same exact reasons. He also argued, alternatively, that he should be able to amend his complaint. And I do take issue with that. He filed his post-judgment or post-trial motion based on Section 5-2-1203 of the Illinois Code of Civil Procedure. That section specifically provides that you can only seek the relief as provided in that section. And the Illinois Supreme Court has long held that that is the case. And there are multiple cases, all cited in my brief, that say a motion to amend a complaint is not a proper motion under Section 5-2-1203. It's not within the relief authorized under that section. A motion to amend a complaint is under 5-2-616. Okay? And when you look under 6-16, it explains that you can amend the facts, right, and you can also amend a complaint, but not prior to a final judgment. And that's what he did. He's relying on 6-17, correct? Well, 6-17 doesn't apply either. And I've cited a case, a Foley case, I think it was, which also ruled that that doesn't apply as well. And if you look at 7-17, it says the plaintiff has pleaded or established facts which entitle the plaintiff to relief, but that he has sought the wrong remedy and permit the amended of pleading on reasonable terms upon the evidence. Okay? But he's never identified what kind of amended pleading he wants to file. Not in the post-trial motion, not even before that. He claims he said that in actually a post-trial brief, but if you read the post-trial brief, he makes it very clear. All he's pursuing is an accounting at that time. So the judgment had entered, the court had ruled against him, and he says, well, wait, I want to file something completely separate. It has to be based on the evidence that was presented. He's never identified what that evidence, what kind of claim that would be. And quite frankly, the court had already ruled summary judgment on the contracts. It had ruled that no accounting was necessary and found that there was no duress. So I'm still a little wondering what kind of complaint he was proposing to amend. Okay? But I don't think it was allowed. It certainly wasn't allowed under 6-16, wasn't allowed under 6-17, under that one case, which is the only one I could find on the subject. And it certainly wasn't allowed in the motion that he brought, which was the 1203 motion, which does not provide that you can amend the complaint. I guess I still have time, so I'm going to keep rolling. I thought I was done, so. You know what? I'll stop. Thank you. All right. Thank you very much, Mr. Westphal. Thank you. Mr. Potter, you may address the Court in rebuttal. Thank you, Your Honor. I would just point out that the language of 6-17 is mandatory. And that the ordering distribution from the escrow was not a final order, so I didn't have to appeal it then. And I chose not to appeal that part of it at this stage because the money was going out of the escrow anyway, so it wouldn't have gained anything. As far as hard bargaining, let's go back to Leibowitz and look at this was the case where the managing partner was in charge of distributions in a pass-through entity. And he wouldn't ever distribute money so that the others would have enough money to pay the tax that the income had generated. And they were forced then, because he would keep doing this, they were forced to buy out his share at a reduced price. They went back and sued him and won. So why wasn't the managing partner in Leibowitz, let's call that hard bargaining? But you can't do that. That's a sharp practice. And I just don't know how it can be said that partners and co-shareholders can treat each other that way. And that's the same sort of thing we're hearing. Mr. O'Shea was willing to sacrifice the whole deal to both of their detriment until his demands were met. And that's a sharp practice. It's prohibited by Leibowitz. And the other cases that I cite. The remedy you're asking for is for us to redistribute the assets, correct? You didn't ask for rescission of the entire contract, did you? The remedy I have asked for is to reverse the summary finding and judgment thereon that the so-called hard bargaining was permissible. And to send it back for a trial on the issue, because it shouldn't have been done summarily. And to send this back to the lower court for a trial on the issue of an accounting. No, I'm not asking that you sit here and do all the numbers. No, no, no. I know that. But, I mean, in your complaint, you're asking that the assets be reallocated. Yes. You're not asking for complete rescission. Of the, of which deal? Well, I guess it would have to be, it can't be the deal with the third party. It would have to be the deal between your client. No, I'm just asking if the assets be allocated fairly as if this hard bargaining hadn't happened. According to their ownership in the company. I mean, counsel read the trial court's ruling on the accounting where the trial court found that this was a mere suspicion? Yes. I mean, do you agree with that? No. Well, I think, at page, I mean, at page three of your reply brief, you say Vanderbilt is entitled to discovery on phase two to flesh out his, quote, mere suspicion, end quote. I, that doesn't mean I agreed with the trial judge. I was just quoting what the trial judge had said. That's a good point, Your Honor. We had been through one phase of discovery on phase one. In order to come forward with all the numbers, we could perhaps have had to hire forensic accountants or something, some people who were knowledgeable in the pharmacy business to say, hey, why is this guy hiring a relief pharmacist for a pharmacy that generates this size of, this volume of prescriptions, that that's double or triple the number of relief pharmacists who should have been employed, something like that. That's a phase two issue, and we never got to do that. But on the issue of hours, counsel alluded to the fact, and I want you to respond, that all the years they were working together, Mr. Vanderbilt never really trusted Mr. O'Shea for any accounting on the hours. Is that true? That is true to a point where when Mr. O'Shea became recalcitrant on this deal, that caused Mr. Vanderbilt to dig into things more than he had. And Morrison is quite a ways from Sycamore, an hour and a half or whatever. And so Mr. Vanderbilt wasn't there all the time to manage and look over anybody's shoulder. And things were going fine for quite a number of years, and then things turned sour, and Mr. O'Shea wasn't living up to his duties, and that caused Mr. Vanderbilt to dig deeper. That's what that was. And then, you know, we had the pension. He took people's bonuses that should have gone to Sonny Garza, who quit because of it. And we just feel that we are entitled to an accounting and entitled to discovery on phase two to prove up that part of the case. Thank you very much. Thank you. Thank you. All right. I'd like to thank both counsel for the quality of the arguments here this morning. The matter will, of course, be taken under advisement, and a written decision will enter a due course. We stand adjourned for the day subject to call. Thank you. Thank you.